# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **EDDIE MORROW, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **Case No. 4:14CV1606NCC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Eddie Morrow, Jr., (Plaintiff) for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. Plaintiff has filed a brief in support of the Complaint. (Doc. 13). Defendant has filed a brief in support of the Answer. (Doc. 18). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). (Doc. 8).

## I.
## PROCEDURAL HISTORY

On February 16, 2011, Plaintiff filed his application for DIB, alleging a disability onset date of December 20, 2009. (Tr. 10, 161-69). Plaintiff's

application was denied, and he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 66-72). After a hearing, the ALJ found Plaintiff not disabled in a decision dated May 14, 2013. (Tr. 10-19). On July 15, 2014, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6). As such, the ALJ's decision stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page

v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. See id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). See Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other

jobs in the national economy that can be performed by a person with the claimant's RFC. See Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

The concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by

substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. See Krogmeier, 294 F.3d at 1022. See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints. See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. See id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used. An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which the ALJ finds credible. See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the

plaintiff's subjective complaints of pain for legally sufficient reasons. See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

## III.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. See Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

At the hearing, Plaintiff amended his alleged onset date to March 30, 2010. (Tr. 28). Plaintiff testified that he was a self-employed contractor, who did roofing, siding, plumbing, and electrical work; that he trained in plumbing through his father's business; and that he had worked for a union as a shop steward. (Tr. 29-31). Plaintiff also testified that he had constant severe pain and swelling in both his knees; that he was unable to crawl, squat, or kneel; that he could not bend without pain; and that, because of his pain, he could only concentrate for five to ten minutes at a time before needing to take a ten to fifteen minute break. (Tr. 37-48).

The ALJ found that Plaintiff met the insured status requirements through December 31, 2015; that he had not engaged in substantial gainful activity since

his amended alleged onset date of March 30, 2010; that he had the severe impairments of degenerative joint disease of the bilateral knees and status post left knee replacement; and that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ further found that Plaintiff had the RFC to perform the full range of light work in that he could lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk for six hours out of an eight-hour workday, and sit for six hours out of an eight-hour workday. The ALJ also found that Plaintiff had to avoid climbing ropes, ladders, and scaffolds; that he could frequently kneel, crouch, or crawl; and that he had to avoid the hazards of heights. After considering the testimony of a VE, the ALJ concluded that Plaintiff could not perform any of his past relevant work; that there was work in the national economy which Plaintiff could perform; and that, therefore, Plaintiff was not disabled.

Plaintiff contends the ALJ's decision is not based on substantial evidence because the ALJ gave improper weight to the opinion of Felix Ungacta, M.D., because the ALJ's RFC determination was not consistent with Social Security Regulation (SSR) 96-8p, 1996 WL 374184 (July 2, 1996), and because the ALJ failed to properly consider Plaintiff's credibility. (Doc. 13 at 6-13). For the following reasons the court finds, for reasons other than those suggested by

Plaintiff, that the ALJ's decision is not based on substantial evidence and that, therefore, this matter should be reversed and remanded to the Commissioner.

## A.    Plaintiff's Credibility:

The court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including Plaintiff's RFC. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010). As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ. See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882.

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir.

1995).  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).  See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  For the following reasons, the court finds that the ALJ's determination that Plaintiff was not *entirely* credible is based on substantial evidence.  (Tr. 15).

First, the ALJ considered objective test results relevant to Plaintiff's allegations that he suffered from constant bi-lateral knee pain and swelling and that these symptoms required that he take work breaks every ten to fifteen minutes.  In

this regard, a May 30, 2008 magnetic resonance imaging scan (MRI) of Plaintiff's left knee showed severe degenerative changes throughout the knee, and "marked degradation of [the] medial and lateral menisci with suggestion of superimposed tears in the posterior horn of the medial meniscus and anterior horn of the lateral meniscus." (Tr. 15, 323). The impression from a December 8, 2009 MRI of Plaintiff's left knee was severe degenerative changes throughout the knee, which changes were not significantly different from Plaintiff's 2008 MRI. It was noted that Plaintiff had a "chronically torn ACL." (Tr. 347). A November 5, 2010 x-ray showed significant degenerative changes in Plaintiff's left knee. (Tr. 293).

After Plaintiff's November 2010 knee replacement surgery, when Plaintiff complained of "some pain" in his left knee and of right knee pain, Dr. Ungacta reported, on December 7, 2011, that an x-ray showed Plaintiff's left knee replacement was positioned "very well," with no evidence of loosening and that a right knee x-ray showed "80% joint space narrowing of the medial tibiofemoral joint line consistent with osteoarthritis." (Tr. 332). An April 14, 2011 x-ray showed that Plaintiff's "[t]otal left knee replacement [was] in place." Dr. Ungacta reported that the x-ray showed that Plaintiff had "a well positioned, cemented total knee artroplasty," with "[n]o evidence of loosening." (Tr. 16, 325-26). Dr. Ungacta reported, in May 2012, that a fluoroscopic examination of Plaintiff's left

knee replacement showed no evidence of loosening and that the components were well positioned.  (Tr. 16, 338).

Second, the ALJ considered findings of Plaintiff's medical providers.  (Tr. 15).  Indeed, on May 30, 2008, when Plaintiff presented to his primary care physician, Lavert Morrow, M.D., with pain in his left knee, upon examination, Dr. Morrow reported that Plaintiff's knee was tender and that he had reduced range of motion (ROM).  Dr. Morrow prescribed Motrin.  (Tr. 15, 312).  On June 2, 2008, Plaintiff told Dr. Morrow that Motrin gave him no relief.  (Tr. 15, 311).  On June 10, 2008, Plaintiff told Dr. Morrow that he had seen an orthopedist, who drained his left knee and administered a cortisone injection.  Plaintiff also complained of pain and swelling in his right knee on this date.  (Tr. 15, 310).  At subsequent visits in June, July, and October 2009, Plaintiff continued to complain of pain and swelling in his left knee.  (Tr. 15, 307-309).

As considered by the ALJ, Plaintiff presented to the emergency room (ER), on February 24, 2010, with "annoying chest pain."  On this date, Plaintiff was assessed with atypical chest pain, which was probably musculoskeletal.  Plaintiff's blood tests showed his troponin levels were normal  (Tr. 15-16, 349, 354).[1]

---

[1]  "The troponin test measures the levels of certain proteins call troponin T and troponin l in the blood.  . . .  The more damage there is to the heart, the greater the amount of troponin T and 1 there will be in the blood." http://umm.edu/health/medical/ency/articles/trolponin-test.  (last visited 06/24/2015).

Plaintiff was discharged, with directions to follow up with a cardiologist and undergo a stress test. (Tr. 15-16, 349-50).

When Plaintiff presented to the Metro Heart Group, in April 2010, Plaintiff stated that he had not experienced "much chest pain" since he presented to the ER in February 2010. John W. Kilgore, M.D., reported that his impression was that Plaintiff had normal left ventricular systolic function, an estimated ejection fraction of "60- 65%,"[2] moderate left ventricular hypertrophy with suggestion of diastolic dysfunction, mild tricuspid regurgitation, and mild pulmonary hypertension. (Tr. 16, 264-66).

Dr. Morrow reported, on June 14, 2010, upon examination, that Plaintiff's respiratory pattern was "regular with symmetrical movements and no distress"; Plaintiff's heart was regular in rate and rhythm, with no significant rubs, gallops, or clicks; Plaintiff had localized edema in his left upper leg; Plaintiff had limited ROM and pain in his left knee; and Plaintiff had no neurological abnormalities.

---

[2] "The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal. An LV ejection fraction of 50 percent or lower is considered reduced. Experts vary in their opinion about an ejection fraction between 50 and 55 percent, and some would consider this a 'borderline' range." http://www.mayoclinic.com/health/ejection-fraction/AN00360 (last visited 07/06/2015)

Dr. Morrow further reported that Plaintiff was "OK for knee surgery," and that he had benign hypertension. (Tr. 321-22).

As further considered by the ALJ, on November 19, 2010, Dr. Ungacta performed a total left knee artroplasty. (Tr. 16, 294). Christopher Ogbuokiri, M.D., who saw Plaintiff for postoperative medical management, on November 21, 2011, reported that Plaintiff had no chest pain or shortness of breath; he was negative for vision, hearing, and speech problems; Plaintiff denied neck stiffness, abnormal sensation, and abnormal limb movements; Plaintiff's neck was supple and his chest was clear; Plaintiff had no edema in his extremities, although his left leg was in brace; and his cranial nerves were grossly intact with no focal deficits. The plan was for Plaintiff to continue with pain medication, continue "routine postoperative care," and start sequential compression devices. (Tr. 272).

On November 22, 2010, upon Plaintiff's discharge from the hospital, Dr. Ungacta noted that Plaintiff had an "unremarkable postoperative course"; on "postop day #1," Plaintiff's drain was removed; on "postop day #2," Plaintiff's incision was clean, dry, and intact; and, on "postop day #3," Plaintiff was discharged to home and was to have physical therapy three times a week. (Tr. 274).

On April 15, 2011, when Plaintiff complained that he still had a "moderate amount of pain," Dr. Ungacta reported that, upon examination, Plaintiff's left knee

had "*minimal effusion, full extension, flexion to 130 degrees, [was] stable to varus and valgus stress, [had] no sign of infection, [and] the incision [was] clean, dry, and intact*." The plan was for Plaintiff to continue taking hydrocodone and "give it some time, it should get better over the next few weeks." (Tr. 16, 326) (emphasis added). On December 7, 2011, when Plaintiff said he was "still having some pain in[] his left knee," Dr. Ungacta reported that physical examination of Plaintiff's knee showed "*minimal effusion, no sign of infection, full extension,* [and] *flexion to 120 degrees*." (emphasis added). Dr. Ungacta further reported that he would see Plaintiff as needed. Plaintiff also complained of right knee pain on this date. Upon examination, Dr. Ungacta noted that Plaintiff had right-knee tenderness to palpation and that he would recommend "permanent disability" for Plaintiff. (Tr.16, 332) (emphasis added).

On May 19, 2012, Plaintiff told Dr. Ungacta that he was "still having [a] significant amount of pain in[] his left knee." Upon examination of Plaintiff's left knee, Dr. Ungacta reported that there was "*minimal effusion*"; that Plaintiff had "*full extension/flexion to beyond 125 degrees*; that the knee was "stable to varus/valgus stress testing with negative Lachman's examination"; and that there was no sign of infection or erythema. Dr. Ungacta noted that Plaintiff might "need a total knee arthroplasty revision." The plan was for Plaintiff to continue with his disability applications. (Tr. 338) (emphasis added).

Third, as considered by the ALJ, Plaintiff was not completely honest with his hearing testimony. (Tr. 17). Specifically, the ALJ considered that although Plaintiff initially testified that he took narcotic medication every three days or every other day to control his pain, he subsequently testified that he had not seen Dr. Ungacta in a year and that he generally took over the counter pain medication. When further questioned by the ALJ regarding his conflicting testimony, Plaintiff testified that he took over-the-counter medication because his insurance "ran out" and he had no insurance.[3] (Tr. 15, 17, 39, 45-46).

## B.    Dr. Ungacta's opinion:

As stated above, in regard to Plaintiff's credibility, Dr. Ungacta opined on several occasions that Plaintiff was disabled and could not work. Also, as considered by the ALJ, Dr. Ungacta completed a Physical Capacities Evaluation form, on August 5, 2011. Dr. Ungacta opined, on this form, that Plaintiff did not need an opportunity to alternate sitting and standing during the day; that Plaintiff could not use his hands to perform simple grasping, pushing and pulling, or fine manipulation; that Plaintiff could not use foot controls; that Plaintiff could never lift even "0-6 lbs."; that Plaintiff could never climb, balance, stoop, kneel, crouch,

---

[3]  Plaintiff did not suggest that he sought and was refused assistance in obtaining prescribed medications. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (holding that, despite a plaintiff's argument that he was unable to afford prescription pain medication, an ALJ may discredit complaints of disabling pain where there is no evidence that the claimant sought treatment available to indigents).

crawl, or reach above his shoulder; that Plaintiff could never be exposed to unprotected heights, moving machinery, marked changes in temperature, and exposure to dust fumes, and gasses; and that Plaintiff suffered from fatigue, which prevented him from working full time, even in a sedentary job. (Tr. 16, 327-28).

Dr. Ungacta also opined, in a December 7, 2011 note imposing work restrictions, that, due to his bilateral knee pain with degenerative joint disease, Plaintiff should not perform any bending or stooping and that he should not walk for prolonged periods. (Tr. 16-17, 334). Also, on May 19, 2012, Dr. Ungacta stated, in a note imposing work restrictions, that Plaintiff needed to undergo further surgery; that Plaintiff could not walk or stand for more than fifteen minutes at a time; that he could not bend or stoop; and that he would not be able to perform any sort of sedentary work. (Tr. 17, 335).

Dr. Ungacta further opined, on August 10, 2012, on a form, that Plaintiff did "not have great ROM of the [left] knee"; in regard to Plaintiff's gait, that he used a cane and might need assistance, "sometimes"; that Plaintiff's pain was severe and precluded a skilled occupation; that Plaintiff could never left even lift "0-4 lbs"; that Plaintiff could stand/walk less than one hour during an 8-hour workday; that he could sit six or more hours in an 8-hour workday; that he needed the opportunity to alternate sitting and standing; and that he could never bend, squat, crawl, climb stairs or ladders, perform hazardous work, or operate foot controls.

(Tr. 17, 339-40). The ALJ stated that she gave Dr. Ungacta's opinion minimal weight. (Tr. 17).

Plaintiff argues that the ALJ failed to properly consider the above-described opinions of Dr. Ungacta. (Doc. 13 at 6-9). Notably, Plaintiff acknowledges that Dr. Ungacta's opinions "possibly" allowed for a range of sedentary work, but further argues that the Medical Vocational Guidelines (the Guidelines) would still have directed a finding of disabled. (Doc. 13 at 8). For the following reasons, the court finds many of Plaintiff's arguments without merit, although the court does find that Dr. Ungacta's opinion does possibly allow for a range of sedentary work.

Sedentary work is defined by 20 C.F.R. § 404.1567(a) as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Further, SSR 85-15, 1985 WL 56857, at *5, states that:

Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. . . . If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact.

The sitting requirement for the full range of sedentary work "allows for normal breaks, including lunch, at two hour intervals." Ellis v. Barnhart, 392 F.3d

988, 996 (8th Cir. 2005) (citing SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996)).

Additionally the range of sedentary jobs requires a claimant "to be able to walk or stand for approximately two hours out of an eight-hour day. The need to alternate between sitting and standing more frequently than every two hours could significantly erode the occupational base for a full range of unskilled sedentary work." Id. at 997 (citing SSR 96-9p, 1996 WL 374185 at *7). Moreover, SSR 96-9p requires that "the RFC assessment should include the frequency with which an applicant needs to alternate between sitting and standing, and if the need exists, that vocational expert testimony may be more appropriate than the grids." Id. It also states that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of disabled." 1996 WL 374185 at *1.

First, as considered by the ALJ, Dr. Ungacta's treatment notes did not support his opinions regarding the severity of Plaintiff's limitations. (Tr. 17). Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record). For example, as set forth above in regard to

Plaintiff's credibility, Dr. Ungacta reported, after Plaintiff's surgery, that he had minimal effusion, full extension and flexion ranging from 120 to 130 degrees. (Tr. 332, 326, 338).

To the extent Plaintiff argues that the ALJ erred in characterizing Dr. Ungacta's ROM findings as indicating Plaintiff had full ROM (Tr. 16), Dr. Ungacta did report that Plaintiff's left knee ROM was only forty-five degrees, but this was on one occasion, on November 29, 2010, which was ten days after Plaintiff's knee replacement surgery (Tr. 301). (Doc. 13 at 7). Notably, eight days later, Dr. Ungacta reported that Plaintiff had full extension and flexion of 120 degrees. (Tr. 16-17, 332). Moreover, as considered by the ALJ, Dr. Ungacta's ROM findings after November 2010 were more contemporaneous with his various medical opinions regarding Plaintiff's ability to engage in work activities. (Tr. 16, 326, 332, 338). To the extent the ALJ may have mischaracterized Dr. Ungacta's ROM findings, a deficiency in decision writing does not require reversal where the ALJ's overall conclusion is supported by substantial evidence. See Karlix v. Barnhart, 457 F.3d 741, 746 (8th Cir. 2006).

Second, as considered by the ALJ, in August 2012, when Dr. Ungacta imposed extreme limitations on Plaintiff, Dr. Ungacta acknowledged that he had not examined Plaintiff since May 2012. (Tr. 339). Cf. Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (holding that a doctor's opinion stated in a checklist

should not have been given controlling weight because the doctor had met with the plaintiff only three times at the time he completed the form).

Third, to the extent Dr. Ungacta opined that Plaintiff was disabled, the ALJ was not bound by Dr. Ungacta's conclusory statements of total disability given that the ALJ identified good reasons for not accepting Dr. Ungacta's opinion. See Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014) ("Whether granting 'a treating physician's opinion substantial or little weight,' Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000), the Commissioner must 'always give good reasons . . . for the weight' she gives, 20 C.F.R. § 416.927(d)(2).").

Fourth, to the extent Dr. Ungacta indicated the extent to which Plaintiff could engage in work-related activities by making checkmarks on a form, a treating physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004).

Fifth, although Dr. Ungacta was Plaintiff's treating physician, it was the ALJ's role to evaluate the record as a whole, see Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001), and Dr. Ungacta's finding that Plaintiff could not even engage in sedentary work invaded the province of the Commissioner to make the ultimate disability determination, see Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012).

Sixth, to the extent Dr. Ungacta opined that Plaintiff had restrictions regarding his ability to *use his hands and arms* and his *exposure to changes in temperature and irritants*, *Dr. Ungacta's treatment notes fail to indicate any limitations in this regard*. Also, as discussed above, Dr. Morrow reported *no irregularities in Plaintiff's cardiovascular and neurological systems*. (Tr. 321).

Indeed, the court finds that substantial evidence in the record as a whole supports the ALJ's failure to find that Plaintiff had limitations in regard to use of his hands and exposure to irritants and the ALJ's failure to find that Plaintiff had any severe conditions other than those related to his knees. The court further finds, however, despite the above-stated reasons supporting certain aspects of the ALJ's decision discrediting the extreme limitations imposed by Dr. Ungacta, that the ALJ's ultimate RFC determination that Plaintiff could *stand or walk for six hours* in an eight-hour workday and that Plaintiff could *frequently kneel, crouch, and crawl*, despite his left knee replacement and possible need for a right knee replacement, is not based on substantial evidence. The court will, therefore, direct that this matter be reversed and remanded to the Commissioner for purposes of reconsidering Plaintiff's RFC.

Given that there is no support in the record for many of the extreme limitations imposed by Dr. Ungacta, and given that substantial evidence does not establish that Plaintiff could stand or walk for six hours in an eight-hour workday

and frequently kneel, crouch, and crawl, upon remand, the ALJ should order that Plaintiff undergo a consultative examination for the purposes of determining the extent to which Plaintiff has restrictions related to his knees. In particular, the consultative examiner should opine what, if any, limitations Plaintiff has in lifting weight of any amount, standing, sitting, walking, kneeling, crouching and crawling. The consultative examiner should also opine whether Plaintiff has restrictions in regard to exposure to hazards and heights. Based on the report of the consultative examiner, the ALJ should redefine and clarify Plaintiff's RFC. In particular, the ALJ should consider whether Plaintiff is capable of performing sedentary work. After doing so, the ALJ should consult a VE and consider the Guidelines to determine whether there is work which Plaintiff can perform.

## VII.
## CONCLUSION

The court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4. Upon remand, the ALJ is directed to fully develop the record in a manner consistent with this court's opinion.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in his Brief in Support of Complaint is **GRANTED** in part, and **DENIED**, in part. (Docs. 1, 13).

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will issue contemporaneously herewith remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4.

**IT IS FINALLY ORDERED** that, upon entry of the Judgment, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.

Dated this 6th day of July 2015.

/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE